UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATESHA MOON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 12-CV-05593 |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Latesha Moon, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Supplemental Security Income ("SSI") and Social Security Disability Insurance ("SSDI") benefits (collectively herein, "disability benefits") under the Social Security Act ("Act").[1] Ms. Moon has filed a motion for summary judgment, seeking to reverse the SSA's final decision or remand the case for consideration of the issues raised herein. For the reasons set forth below, Ms. Moon's motion is denied [dkt. 16].

## I.    PROCEDURAL HISTORY

Ms. Moon applied for SSI and SSDI benefits on September 5, 2008.[2] Ms. Moon alleged she became disabled on August 27, 2008,[3] due to morbid obesity, chronic back pain, hip problems, knee problems, and migraines.[4] The SSA denied Ms. Moon's applications on November 20, 2008,[5] and

---

[1] 42 U.S.C. §§ 416(I), 423, and 1381 *et seq.*
[2] R. at 154, 159.
[3] R. at 154.
[4] R. at 95.
[5] R. at 96.

denied her request for reconsideration on January 22, 2009,[6] because the SSA found that Ms. Moon was still able to perform sedentary work and other types of work less demanding than Ms. Moon's previous work.[7]

Then on March 17, 2009, Ms. Moon requested a hearing before an SSA Administrative Law Judge ("ALJ")[8] which the SSA granted on April 7, 2009.[9] ALJ Curt Marceille conducted the hearing on May 4, 2010.[10] Following the hearing the ALJ issued an unfavorable decision on December 1, 2010, concluding that Ms. Moon was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Act.[11]

Next, on January 4, 2011, Ms. Moon requested the SSA Appeals Council ("AC") review the ALJ's unfavorable decision.[12] Between September 30, 2011, and February 8, 2012, Ms. Moon provided several additional pieces of medical evidence to the AC.[13] On April 9, 2012, the AC denied Ms. Moon's request for review of the ALJ's decision.[14] Therefore the ALJ's decision to deny disability benefits became the final decision of the SSA.[15] Ms. Moon filed a complaint in this Court on July 17, 2012, seeking judicial review of the final decision of the SSA.

---

[6]R. at 105.
[7]R. at 108.
[8]R. at 112.
[9]R. at 115.
[10]R. at 45.
[11]R. at 40.
[12]R. at 15.
[13]R. at 289, 560.
[14]R. at 8.
[15]*Id.*

## II.      FACTUAL BACKGROUND

At the time of the hearing before the ALJ, Ms. Moon was twenty-six years old and lived alone with her eight-year-old daughter.[16] Ms. Moon's most recent employment was a certified nursing assistant for approximately six months,[17] where she helped individuals in their homes with their daily needs.[18] Before her nursing assistant position, Ms. Moon held employment as a cashier, bank teller, and pharmacy technician.[19] Ms. Moon has at least a high school education.[20] She spends much of her time with her daughter and other family, particularly her sister.[21]

### A.      Ms. Moon's Medical Background and Records

Since at least 2005 Ms. Moon has been treated for a wide variety of medical conditions including: lumbar facet hypertrophy with mild narrowing, lumbago, obesity, mild sleep apnea, headaches, diabetes, anemia, heart trouble, and hip, knee and feet problems.[22] Here we will briefly review the relevant medical records.

### 1.      Friend Family Health Center, Inc.

Ms. Moon visited the Friend Family Health Center urgent care center in January 2005 and March 2005.[23] During the January 2005 visit, Ms. Moon complained of headaches, body aches, and fatigue.[24] It is not clear if the medical professionals prescribed any treatment during this visit.

During the March 2005 visit, Ms. Moon complained of congestion, sneezing, and wheezing.[25]

---

[16]R. at 49.
[17]R. at 227.
[18]R. at 53.
[19]R. at 227.
[20]R. at 50.
[21]R. at 77.
[22]R. at 31.
[23]R. at 297, 299.
[24]R. at 299.
[25]R. at 297.

The medical professionals noted during this visit that Ms. Moon refused to take Amitriptyline and Wellbutrin for her headaches that was previously prescribed to her.[26] They also noted that Ms. Moon requested a letter for public aid to say she needs to work less, and Ms. Moon was currently working at Wendy's 5.5 hours a day two days a week.[27]

## 2. Blue Island Medical Center

Kimberly Baker, M.D. treated Ms. Moon numerous times between April 2005 and March 2008.[28] The reasons for most visits were headaches, back pain, and other minor accidents.[29] Dr. Baker prescribed Zomig and Vicodin.[30] At the May 6, 2005, visit, Dr. Baker noted Ms. Moon was working at the time while also complaining of back pain and migraines.[31]

## 3. Calumet Park Medical Center

Ms. Moon visited the Calumet Park Medical Center six times between December 3, 2005, to February 7, 2006, due to headaches, migraines, and back pain.[32] An examiner noted that Vicodin did not help Ms. Moon.[33] Zomig and Propranolol were prescribed along with the Imitrex Ms. Moon was already taking.[34]

Ms. Moon's visited in December 2005 because she slipped on ice and hit her knee very hard.[35] The medical center subsequently prescribed ibuprofen and ordered an MRI.[36] The MRI

---

[26]R. at 297.
[27]R.at 297.
[28]R. at 314-31.
[29]R. at 318-329.
[30]R. at 323, 327.
[31]R. at 328.
[32]R. at 307-10.
[33]R. at 310.
[34]R. at 310-11.
[35]R. at 308.
[36]*Id.*

revealed no evidence of internal knee derangement.[37]

**4.      South Suburban Hospital**

The South Suburban Hospital performed two sleep studies on Ms. Moon in November 2008 and February 2009.[38] Ms. Moon sought the sleep study because of disruptive snoring, excessive daytime sleepiness, morning headaches, difficulty falling and staying asleep, decreased memory, decreased concentration, nonrestorative sleep, obesity, and restless legs.[39] The studies revealed that Ms. Moon had mild sleep apnea.[40] The sleep center recommended that the Ms. Moon should always sleep with a continuous positive airway pressure machine and make every effort to lose weight.[41]

**5.      William Crevier, M.D., Family Christian Health Center**

Dr. Crevier at the Family Christian Health Center served as Ms. Moon's primary care physician,[42] and Ms. Moon visited him numerous times during the time period of at least February 2009 through March 2010.[43] Ms. Moon visited Dr. Crevier for several complaints, the most notable being migraines,[44] tiredness,[45] depression,[46] and back pain.[47] Over the course of several office visits, Dr. Crevier diagnosed Ms. Moon with sleep apnea, knee pain, lumbago, cholelithiasis, migraines, morbid obesity, atypical chest pain, myalgia, and depression.[48]

---

[37]R. at 312.
[38]R. at 431.
[39]*Id.*
[40]*Id.*
[41]R. at 431, 432.
[42] R. at 541.
[43]R. at 517, 551.
[44]R. at 517.
[45]*Id.*
[46]R. at 524.
[47]R. at 539.
[48]R. at 533, 545, 548, 552-53.

Dr. Crevier conducted several tests to make these diagnoses. In September 2008 he ordered MRIs of Ms. Moon's thoracic spine and lumbosacral spine.[49] These tests revealed a cystic structure in the pelvis.[50] Approximately two weeks later Dr. Crevier ordered an MRI of Ms. Moon's brain, and it was "unremarkable" and revealed no cause for headaches.[51] In February 2009 Dr. Crevier ordered an electrocardiogram, a thyroid stimulating hormone test, a comprehensive metabolic profile, and a complete blood count.[52] Most notably, these tests revealed normal variations in heart rate, but an otherwise normal functioning heart,[53] and a glucose level slightly above the normal range.[54]

Throughout the course of treatment, Dr. Crevier prescribed Propranolol, Imitrex, Daypro, Ultram, Trazamine, and Cymbalta.[55] Dr. Crevier prescribed Ms. Moon physical therapy.[56] In May 2009 the Family Christian Health Center provided weight management education to Ms. Moon, which included recipes, dietary changes, alternative food preparation, and exercise programs.[57] The medical center noted Ms. Moon understood these instructions and was very receptive of them.[58]

**6. Palos Community Hospital**

In June 2009 Ms. Moon visited the Palos Community Hospital due to lower abdominal pain, the inability to stand, and back pain.[59] The hospital performed several examinations and laboratory

---

[49]R. at 336-37.
[50]R. at 337.
[51]R. at 335.
[52]R. at 520-523.
[53]R. at 523.
[54]R. at 522.
[55]R. at 518, 533, 545, 553.
[56]R. at 481.
[57]R. at 541.
[58]*Id*.
[59]R. at 442.

tests including a pelvic ultrasound.[60] Ms. Moon was instructed to follow up with her physician the next day.[61]

Ms. Moon attended one physical therapy appointment at Palos Community Hospital.[62] The therapists first performed an evaluation in March of 2009,[63] and one week later Ms. Moon attended her sole physical therapy visit.[64] Ms. Moon either cancelled or did not show up to all other scheduled appointments.[65] The physical therapists noted that Ms. Moon "responded well to therapy and reported a significant pain reduction at that time."[66] Ms. Moon made no further attempts to contact the physical therapists, and the therapists were unable to contact Ms. Moon by telephone.[67]

### 7.    Leon M. Huddleston, M.D.

In August 2009 Ms. Moon visited Dr. Huddleston with complaints of migraine headaches and low back pain.[68] Following the new patient history and physical examination, Dr. Huddleston diagnosed Ms. Moon with tension headaches and low back pain.[69] Also during this visit Dr. Huddleston prescribed ibuprofen, recommended Ms. Moon discuss her glucose levels with Dr. Crevier, and recommended an epidural injection.[70] Then in September 2009 Dr. Huddleston administered an epidural injection to relieve Ms. Moon's back pain.[71]

---

[60]R. at 447-51.
[61]R. at 443.
[62]R. at 476.
[63]*Id.*
[64]*Id.*
[65]*Id.*
[66]*Id.*
[67]*Id.*
[68]R. at 484.
[69]*Id.*
[70]R. at 485.
[71]R. at 486.

**8. J.J. Shin, M.D., Grand Prairie Services**

Ms. Moon visited Dr. Shin three times for depression between November 2009 and February 2010.[72] Dr. Shin diagnosed Ms. Moon with major depression,[73] and prescribed Cymbalta and Trazodone for both Ms. Moon's depression and insomnia.[74] Dr. Shin noted Ms. Moon was Grand Prairie Service's patient in 2004 and 2005 but stopped treatment.[75] Dr. Shin also noted that Ms. Moon reported that she was unemployed due to lack of work rather than disability.[76] Finally, Dr. Shin noted "A physician's form was completed by her lawyers who assisted to get [Social Security]."[77]

Dr. Shin completed a Mental Impairment Questionnaire during the February 2010 appointment.[78] In this Social Security questionnaire Dr. Shin opined that Ms. Moon had fair ability and aptitude in several areas.[79] He also opined she had poor or no ability to maintain attention for a two-hour segment, complete a normal workday or work week without interruptions from psychologically based symptoms, and perform at a consistent pace without rest.[80] Lastly, Dr. Shin opined Ms. Moon had slight restriction of activities of daily living, moderate difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace, and repeated episodes of deterioration or decompensation.[81] Ms. Moon did not visit Dr. Shin again after he completed this questionnaire.

---

[72]R. at 500.
[73]R. at 497.
[74]R. at 500.
[75]R. at 493.
[76]*Id*.
[77]R. at 499.
[78]R. at 503.
[79]R. at 505.
[80]*Id.*
[81]R. at 506.

**9.    Consultative Examinations**

On November 3, 2008, M.S. Patil, M.D. performed an independent internal medicine consultative examination on Ms. Moon.[82] Dr. Patil diagnosed Ms. Moon with extreme obesity and polyarthralgia.[83] Dr. Patil noted most of Ms. Moon's health was normal.[84] In particular he commented that Ms. Moon's heart, mental ability, motor strength, gait, and joints were all normal.[85] Although almost all indications were normal, Dr. Patil did find Ms. Moon's lumbar spine movement was reduced, and she had some difficulty with squats and arises.[86]

Young-Ja Kim, M.D. provided a physical residual functional capacity assessment for purposes of Ms. Moon's disability application on November 18, 2008.[87] Dr. Kim did not examine Ms. Moon, and based his assessment on the opinions of Dr. Patil and Dr. Crevier.[88] He found Ms. Moon to be able to occasionally lift twenty pounds, frequently lift ten pounds, stand/walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push/pull with no limitations.[89] Dr. Kim noted that Ms. Moon was obese and had mild lumber facet hypertrophy.[90] Dr. Kim noted these conditions caused Ms. Moon to have minimal loss of lumbar range of motion.[91] Dr. Kim commented that a review of all other systems was negative and normal.[92] Dr. Kim opined that Ms. Moon should never climb, only occasionally stoop and crouch, and avoid

---

[82]R. at 355.
[83]R. at 357.
[84]R. at 356-57.
[85]*Id.*
[86]R. at 357.
[87]R. at 361-68..
[88]R. at 368.
[89]R. at 362.
[90]*Id.*
[91]*Id.*
[92]*Id.*

concentrated exposure to hazards.[93] Dr. Kim recommended limiting Ms. Moon's exertion and weight bearing activities due to the obesity and lumbar limitation.[94] Dr. Kim found Ms. Moon to be only partially credible since Ms. Moon indicated difficulty using her hands, but the medical evidence did not show any difficulty performing fine and gross manipulations.[95]

On January 15, 2009, Reynaldo Gotanco, M.D. conducted the Illinois Request for Medical Advice.[96] Dr. Gotanco did not examine Ms. Moon. He affirmed the initial determination that Ms. Moon could perform sedentary work.[97] Dr. Gotanco supported this decision by stating there were no allegations of the conditions worsening, no allegations of new impairments, and no new treatments.[98] He also noted the prior determination was substantively and technically correct.[99]

Anthony E. Francis, M.D. completed a medical interrogatory of Ms. Moon on December 23, 2009.[100] Dr. Francis did not examine Ms. Moon. He noted Ms. Moon's main impairment was obesity, and that she could do some level of sedentary or greater work.[101] Dr. Francis concluded that Dr. Kim's opinion appeared appropriate, and he had no reason to change anything in it.[102]

---

[93]R. at 363, 365.
[94]R. at 362.
[95]R. at 368.
[96]R. at 369-71.
[97]R. at 371.
[98]R. at 370.
[99]*Id.*
[100]R. at 423.
[101]R. at 429.
[102]*Id.*

**B.     The ALJ Hearing and Decision**

**1.     Summary of Testimony at the ALJ Hearing**

Ms. Moon's hearing before the ALJ took place on May 4, 2010.[103] Ms. Moon and a vocational expert ("VE") testified.[104] In addition to the ALJ, Ms. Moon's attorney questioned Ms. Moon and the VE.[105]

**a.     Ms. Moon's Testimony**

Ms. Moon began her testimony by discussing her living situation and background. She said that she is single and lives alone with her 8-year-old daughter.[106] Ms. Moon said she was formerly a certified nursing assistant, where she assisted her clients in their homes with daily activities such as bathing and transportation.[107] Ms. Moon said she was fired in August 2008, but she also needed to stop this job because of her pain.[108] Ms. Moon stated after she was fired, she collected unemployment benefits and submitted job applications as late as January 2010.[109] She said she would have taken one of these jobs if accepted to make ends meet, but would have been in significant pain.[110] Then Ms. Moon explained why she was currently unable to work. She stated, "I'm in a lot of pain . . . . My back, my feet hurt every day, and I have migraines. And I can't even do my own dishes because my back hurts so bad. I can't even lean over to wash my hands. I'm in just pain all over. I have these migraines that last for days."[111]

The ALJ then questioned Ms. Moon considerably about her migraine headaches. Ms. Moon

---

[103]R. at 45.
[104]*Id.*
[105]R. at 66-79, 87-89.
[106]R. at 49.
[107]R. at 53.
[108]R. at 51.
[109]R. at 51-52.
[110]R. at 52.
[111]R. at 54.

said she has had migraines for "many years, I can't even count."[112] She described the headaches as getting worse the past two or three years, and they currently last up to three days.[113] Ms. Moon stated she takes her full monthly supply of Imitrex and then takes prescribed Motrin for these headaches.[114] She said these medications help, but do not take the headaches away.[115] Ms. Moon testified she took prophylactic medication for the headaches in 2005, but no longer takes these medications.[116] The ALJ expressed deep curiosity as to why her current doctors do not prescribe prophylactic medications for the alleged severe headaches or have not tried any new treatments when Ms. Moon complains her medications are not effective.[117] The ALJ also pointed out that Ms. Moon's medical records indicated that Ms. Moon was working while suffering from these headaches, the Imitrex was effective, and there were fewer complaints of headaches after the alleged onset date than before when Ms. Moon was working.[118]

Ms. Moon also described her back, foot, and leg pain. Ms. Moon stated she has swelling and pain in her back.[119] Ms. Moon said that she has visited her chiropractor 2-3 times a week for the past few months for bone realignments, cooling packs, and other treatments.[120] Ms. Moon testified she has "very aching, tired feet," there is "stabbing pain up under the bottom" of her feet, and her feet "get numb and tingly" sometimes.[121] She stated she has visited her podiatrist every six weeks for the past year to get her callous trimmed.[122] Then Ms. Moon testified that she has had "shooting pain that

---

[112]*Id.*
[113]*Id.*
[114]R. at 55.
[115]*Id.*
[116]R. at 56.
[117]R. at 57.
[118]R. at 57-58.
[119]R. at 61.
[120]R. at 60-61.
[121]R. at 61.
[122]R. at 62.

goes down both of [her] legs," since she had her daughter eight years ago.[123] She said the leg pain has become much worse recently, and she sometimes cannot walk because of it.[124]

Along with the Imitrex and Motrin mentioned above, Ms. Moon testified about her other current medications. She stated that she takes trazodone for her depression and sleep problems and takes Cymbalta for her fibromyalgia.[125] When the ALJ asked Ms. Moon why there were periods when she did not take her medications, Ms. Moon explained that she "wanted to know what was really going on instead of [the doctors] giving [her] medication and just sending [her] home."[126] In addition she stated that her medications give her side effects such as fatigue, weakness, dry mouth, drowsiness, and chest pains.[127]

Ms. Moon testified about her current capabilities. She said she has not been able to lift more than 8-10 pounds for the past two years due to her back and chest pain.[128] She said when she lifted more than this amount at work, she would be in excruciating pain and would need to take time off work.[129] Ms. Moon said she can sit for approximately twenty minutes before she starts to feel back pain and numbness in her legs.[130] She then stated she can only stand for at most fifteen minutes due to back, foot, and knee pain.[131] Ms. Moon described how she must sit down to wash the dishes and it's very painful tp launder clothes and perform other chores because of her pain.[132] Ms. Moon said her daughter and sister must help her with some household chores such as taking out the trash and

---

[123]*Id.*
[124]*Id.*
[125]R. at 59.
[126]R. at 58.
[127]*Id.*
[128]R. at 63.
[129]*Id.*
[130]*Id.*
[131]R. at 64.
[132]R. at 65.

sweeping the floor.[133] Ms. Moon testified that she can sometimes go grocery shopping by herself, but sometimes her sister needs to accompany her.[134]

Ms. Moon testified that on a typical day she gets her daughter ready for school and then must lie down and watch television due to pain.[135] She said she goes to her family's home on the weekends, goes shopping, and the only other time she leaves the house is for appointments.[136] Then Ms. Moon's lawyer questioned Ms. Moon, and Ms. Moon further discussed her limitations. Ms. Moon said that her leg pain and extreme obesity prevent her from doing some daily activities.[137] She indicated that she must use a cane because her legs will "give out" on her.[138] She stated her headaches are so painful that she cannot help her daughter with her homework and must lie down and have complete silence for an unspecified time 2-3 days a week.[139] Ms. Moon also said her sister must sometimes assist her to bathe.[140] Ms. Moon testified that her depression prevents her from recalling simple items and therefore causes much frustration.[141]

Then Ms. Moon explained that her chiropractic treatments provide temporary relief for 2-3 days.[142] She also explained the physical therapy caused her so much pain she could not get out of bed the next day.[143] She said she sometimes misses her appointments because of her pain and depression.[144]

---

[133]R. at 63-64.
[134]R. at 65.
[135]R. at 64.
[136]R. at 65.
[137]R. at 66.
[138]R. at 67.
[139]R. at 72-73.
[140]R. at 74-75.
[141]R. at 75-76.
[142]R. at 68.
[143]R. at 70.
[144]R. at 71.

Ms. Moon then described her sleep study where she was diagnosed with sleep apnea.[145] Ms. Moon stated the Trazodone helped with her sleep problems.[146]

Lastly, the ALJ reexamined Ms. Moon. The ALJ asked Ms. Moon why she waited so long to seek treatment for her depression.[147] Ms. Moon replied that she thought it was "just something that [she] probably would overcome," and that she was in denial.[148] The ALJ then questioned Ms. Moon extensively about the lack of physical therapy. He stated the medical record showed that Ms. Moon attended one physical therapy session and then either cancelled or did not show up to her remaining appointments.[149] The ALJ also stated that the physical therapy notes contradicted Ms. Moon's testimony since the notes said that Ms. Moon had positive effects from the physical therapy.[150] When Ms. Moon responded that the pain came back after the physical therapy, the ALJ then asked how Ms. Moon was able to attend her chiropractic appointments, but not physical therapy sessions since the pain comes back after the chiropractic appointments as well.[151] He also asked Ms. Moon why she did not continue to attend physical therapy when it relieved her pain.[152] Ms. Moon reiterated that she was in considerable pain after the only physical therapy appointment she attended and that she got discouraged.[153]

---

[145]R. at 78.
[146]Id.
[147]R. at 79.
[148]R. at 79-80.
[149]R. at 80-81.
[150]Id.
[151]R. at 81.
[152]Id.
[153]R. at 82.

**b.    The Vocational Expert's Testimony**

The VE reviewed Ms. Moon's work for the fifteen years prior to the hearing.[154] The VE stated Ms. Moon was formerly a certified nursing assistant, bank teller, pharmacy technician, and cashier.[155] These jobs range from light to medium exertion levels and unskilled to the lower end of skilled skill levels.[156]

The VE stated that a hypothetical person: of Ms. Moon's age, education, and work experience; who was able to lift up to twenty pounds occasionally; stand and walk for approximately two hours of an eight hour work day; sit for approximately six hours in an eight hour work day with normal breaks; who was able to occasionally stoop and crouch; and who should never climb ladders, ropes, scaffolds, ramps or stairs would not be able perform Ms. Moon's past work.[157] This is because Ms. Moon can only peform sedentary work due to the two hour standing limitation.[158]

The VE stated Ms. Moon would be capable of performing the duties of order clerk, sedentary cashier, and bench assembler.[159] The VE said there are approximately 2,900, 5,000, and 3,000 of these positions, respectively, in the Chicago metropolitan area.[160] On examination by Ms. Moon's attorney, the VE stated a cane would not interfere with these jobs, missing work once every two weeks would lead to termination, and Ms. Moon would need to be able to stay mentally on task 85% to 90% of the time.[161]

---

[154]R. at 84.
[155]*Id.*
[156]*Id.*
[157]R. at 85.
[158]*Id.*
[159]*Id.*
[160]*Id.*
[161]R. at 87-88.

## 2.    The ALJ's Decision

In an opinion issued December 1, 2010, the ALJ concluded that Ms. Moon had not been disabled from her alleged onset date of August 27, 2008, to the date of the decision within the meaning of the Act, both in terms of SSI and SSID.[162] The ALJ reached this decision because, although Ms. Moon had several severe impairments, she had the ability to perform sedentary work with certain restrictions,[163] and there were jobs that exist in significant numbers in the national economy that Ms. Moon can perform.[164]

SSA regulations prescribe a five-step sequential evaluation process for determining whether an individual is disabled.[165] The ALJ follows the steps in order, and if the ALJ determines that the claimant is or is not disabled at any step, the evaluation does not go on to the next step.[166]

The ALJ's first step is to determine whether the claimant is presently engaged in substantive gainful activity, which would preclude a finding of disability.[167] In the present case, the ALJ determined that Ms. Moon had not engaged in substantial gainful activity since August 27, 2008, the alleged onset date.[168]

The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[169] In this case, the ALJ found that Ms. Moon has the following severe impairments: lumbar facet hypertrophy with mild narrowing, lumbago, obesity, mild sleep apnea, and a history of headaches.[170]

---

[162]R. at 40.
[163]R. at 33.
[164]R. at 38.
[165]20 C.F.R. §§ 404.1520(a), 416.920(a).
[166]20 C.F.R. § 416.920(a)(4).
[167]20 C.F.R. §§ 404.1520(b), 416.920(b).
[168]R. at 31.
[169]20 C.F.R. §§ 404.1520(c), 416.920(c).
[170]R. at 31.

The ALJ's third step is to consider whether the claimant's impairment or combination of impairments meets or medically equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[171] In the present case, the ALJ determined that Ms. Moon's impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.[172] The ALJ concluded Ms. Moon's "musculoskeletal and neurological problems were not close to any listing-level criteria."[173]

When no impairments are found to meet SSA listing requirements in the third step, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform her past relevant work.[174] This involves evaluating the claimant's Residual Functional Capacity ("RFC") based on the record and her testimony and comparing it to the requirements of her past work.[175] A claimant's RFC is the most a claimant can do despite the impairment(s).[176] If determining the RFC requires the ALJ to assess subjective complaints, then she follows a two-step process.[177] First, she determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[178] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on her ability to do basic work

---

[171]20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.
[172]R. at 33.
[173]*Id.*
[174]20 C.F.R. §§ 404.1520(f), 416.920(f).
[175]20 C.F.R. §§ 404.1520(e), 416.920(e).
[176]20 C.F.R. § 404.1545.
[177]20 C.F.R. § 404.1529.
[178]20 C.F.R. § 404.1529(b).

activities.[179] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform her past work, she is not found to be disabled.[180]

In the present case the ALJ found that Ms. Moon had the RFC "to perform sedentary work" as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), except that Ms. Moon can lift 20 pounds occasionally and 10 pounds frequently, stand for 2-hours and sit for 6-hours in an 8-hour workday with a sit/stand option, can only occasionally stoop and crouch, should never climb (ramp, stairs, ladder, rope, or scaffolds), and should avoid exposure to hazards such as unprotected heights and dangerous machinery.[181]

In terms of Ms. Moon's subjective complaints, although the ALJ found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ also found Ms. Moon's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they were inconsistent with the RFC assessment.[182]

In discrediting Ms. Moon's symptoms, the ALJ first noted several examples of when Ms. Moon's statements concerning pain were contradictory to her testimony and actions. The ALJ noted that Ms. Moon was still able to take "daily care of herself and her [seven-year-old] daughter."[183] The ALJ recognized that Ms. Moon submitted job applications as late as January 2010, well after the alleged disability onset date.[184] Along with that, the ALJ pointed out Ms. Moon certified that she is "ready, willing, and able to work," when she filed for unemployment benefits after losing her

---

[179]20 C.F.R. § 404.1529(c).
[180]20 C.F.R. § 404.1520(a)(4)(iv).
[181]R. at 33.
[182]R. at 34.
[183]*Id.*
[184]*Id.*

nursing position.[185] The ALJ also mentioned while Ms. Moon claimed difficulty using her hands, medical evidence "does not show any difficulty with performing fine and gross manipulations," and while Ms. Moon stated she used a cane, she did not bring one to the consultative examination.[186] The ALJ also noted other inconsistencies; Ms. Moon reported greater physical ability during the consultative examination than the hearing, and Ms. Moon denied back pain, headaches, and depression to Dr. Crevier after the alleged disability onset date.[187]

Next, the ALJ focused on Ms. Moon's "limited treatment history," and stated that it lent "very little support to the claimant's allegations of disability."[188] The ALJ noted that Ms. Moon has had only conservative treatment primarily consisting of pain medication for the allegedly disabling pain.[189] The ALJ highlighted that Ms. Moon sought treatment for her alleged mental impairment for only three months and attended only a few physical therapy sessions.[190] The ALJ described how Ms. Moon only received chiropractic treatment for her hip pain, and a podiatrist trimmed a callus on her foot every six weeks.[191] In regards to the knee pain, the ALJ noted that an MRI revealed no knee derangement.[192] The ALJ stated that while Ms. Moon is diabetic, her recent glucose reading was "only slightly above the high end of the normal range . . . ."[193] The ALJ described an episode when Ms. Moon complained of chest pain, but the admitting hospital found no cardiac problems and deemed the situation to not warrant a stress test.[194] Furthermore, the ALJ noted that both an

---

[185]*Id.*
[186]*Id.*
[187]*Id.*
[188]R. at 35.
[189]*Id.*
[190]*Id.*
[191]*Id.*
[192]*Id.*
[193]*Id.*
[194]*Id.*

independent consultative exam and a later electrocardiography test indicated Ms. Moon's heart was fine.[195] For Ms. Moon's back pain, the ALJ found an epidural injection and prescriptions for Ultram and Daypro to be conservative treatment.[196]

Then the ALJ discredited Ms. Moon's allegations of pain because she did not adequately comply with the prescribed treatment for her impairments. The ALJ stated that after Ms. Moon visited Weight Management Education services and learned strategies to combat her obesity, she did not make a "strong effort to follow the instructions to make a significant improvement in her weight loss."[197] Additionally, the ALJ explained that Ms. Moon did not take medication for headaches and back pain due to fear of side effects, but there was no medical evidence of side effects.[198] The ALJ stated Ms. Moon attended only a single physical therapy session after responding well to the treatment.[199] Along with that, the ALJ observed that Ms. Moon said she was in too much pain to get out of bed to go to physical therapy, but yet she was still able to attend her chiropractic appointments.[200]

The ALJ then discredited the severity of Ms. Moon's headaches and considered her sleep apnea. The ALJ noted that Ms. Moon experienced headaches as far back as 2005 when Ms. Moon was working.[201] The ALJ observed that an MRI of Ms. Moon's brain was "unremarkable" and revealed no cause for headaches.[202] The ALJ stated Ms. Moon refused to take medication for fear of side effects, but there was no indication of side effects from the migraine medications.[203] Then the

---

[195]*Id.*
[196]*Id.*
[197]*Id.*
[198]R. at 36
[199]R. at 35.
[200]R. at 36
[201]*Id.*
[202]*Id.*
[203]*Id.*

ALJ noted Ms. Moon had been able to relieve the headaches with Immetrix and Motrin.[204] Regarding her mild sleep apnea, the ALJ found it was "treated well" with a continuous positive airway pressure machine and Trazadone.[205]

Moving to the opinion evidence, the ALJ gave significant weight to the opinions of Dr. Kim and Dr. Francis, who completed physical assessments and medical interrogatories of Ms. Moon.[206] The ALJ stated these opinions were in full agreement with each other and consistent with the medical evidence of record.[207] Furthermore, the ALJ noted that Dr. Patil's independent consultative examination "provides significant support for the opinions of the State agency medical reviewers, [sic] and of Dr. Francis."[208]

The ALJ gave limited weight to the opinion of Dr. Gotanco, who completed the Illinois Request for Medical Advice, because the opinion was just a summary and did not confirm or rebut prior medical opinions.[209] Along with that, the ALJ completely discredited Dr. Shin's psychiatric evaluation.[210] The ALJ noted Dr. Shin diagnosed Ms. Moon with a major depressive disorder, but provided little basis for the claim.[211] The ALJ noted Ms. Moon took no psychotropic medications.[212] The ALJ found noteworthy that Dr. Shin recorded that Ms. Moon's lawyer filled out one of the physician's forms, and Ms. Moon ceased seeking mental health treatment after Dr. Shin completed

---

[204]*Id.*
[205]*Id.*
[206]R. at 37.
[207]*Id.*
[208]*Id.*
[209]*Id.*
[210]*Id.*
[211]*Id.*
[212]*Id.*

the functional capacity assessment.[213] The ALJ also found Dr. Shin's opinion unsupported by limited treatment notes and a lack of treatment.[214]

Given the RFC, the VE found Ms. Moon would be unable to perform her past relevant work as Ms. Moon performed the job or as it should be performed.[215] When the ALJ finds the claimant cannot perform her past work, the ALJ moves to the fifth and final step of the test. The burden shifts to the SSA to prove, considering the claimant's RFC, age, education, and past work experience, that she is capable of performing other work in the local or national economy.[216] In the present case, the ALJ determined Ms. Moon was twenty-four years old on the alleged onset date, had at least a high school education, was able to communicate in English, and had the RFC described above.[217] Considering these characteristics, the VE testified that a hypothetical person similar to Ms. Moon could perform the requirements of occupations such as order clerk, cashier II, and bench assembler.[218] Therefore, based on the VE's testimony, the ALJ determined that jobs existed in significant numbers in the national economy that Ms. Moon could perform.[219]

This concluded the disability assessment through all five steps. The ALJ determined Ms. Moon was not under a disability, as defined in the Act, from August 27, 2008, through the date of the ALJ's decision because she could perform jobs in the national economy.[220]

---

[213]*Id.*
[214]*Id.*
[215]R. at 38.
[216]20 C.F.R. §§ 404.1520(g), 416.920(g).
[217]R. at 38.
[218]R. at 39.
[219]*Id.*
[220]*Id.*

## C.    Medical Evidence Submitted to the Appeals Council After the ALJ Decision

Ms. Moon submitted additional evidence to the AC after the ALJ's decision.[221] Ms. Moon submitted a "Medical Evaluation - Physician's Report" completed by Dr. Crevier who treated Ms. Moon extensively.[222] Dr. Crevier completed this form based on a September 26, 2011, medical examination.[223] He diagnosed Ms. Moon with morbid obesity, sleep apnea, sciatica, depression, and fibromyalgia.[224] Dr. Crevier opined Ms. Moon had more than 50% reduced capacity to walk, bend, stand, stoop, turn, climb, push, and pull.[225] He also opined Ms. Moon had a 20-50% reduced capacity to sit and perform activities of daily living.[226] Dr. Crevier indicated Ms. Moon had the capacity to lift no more than ten pounds at a time during an eight-hour day, five days a week.[227]

Ms. Moon submitted the same form completed by Dr. Huddleston based on a July 25, 2011, examination.[228] Dr. Huddleston stated Ms. Moon had decreased lumbar spine range of motion.[229] Dr. Huddleston opined Ms. Moon had more than 50% reduced capacity to bend, stoop, and climb; 20-50% reduced capacity to walk and perform activities of daily living; up to 20% reduced capacity to stand, sit, turn, push, pull, and travel; and full capacity for fine manipulation, gross manipulation, and finger dexterity.[230] Dr. Huddleston indicated Ms. Moon had the capacity to lift no more than ten pounds at a time during an eight-hour day, five days a week.[231]

---

[221]R. at 289.
[222]R. at 561.
[223]*Id.*
[224]*Id.*
[225]R. at 564.
[226]*Id.*
[227]*Id.*
[228]R. at 565.
[229]R. at 566.
[230]R. at 567.
[231]*Id.*

Ms. Moon also submitted imaging reports from Ingalls Memorial Hospital. Ingalls Memorial Hospital conducted a transthoracic echocardiogram report on August 18, 2011.[232] This report noted no significant defects with Ms. Moon's heart.[233] The hospital conducted an MRI on Ms. Moon's lumbar spine on July 27, 2011.[234] This examination revealed a "moderate degree of degenerative facet changes," most notably in the L4-L5 and L5-S1 areas of the spine.[235] Lastly, Ingalls Memorial conducted an x-ray of Ms. Moon's hip on February 8, 2012.[236] The x-ray revealed no fracture or dislocation.[237] The x-ray did reveal mild to moderate "degenerative changes manifested by joint space narrowing, subchondral sclerosis, and osteophytas."[238]

Lastly, Dr. Huddleston sent a letter to the SSA on December 5, 2011, to state he fully supported Ms. Moon's application for disability benefits.[239] Dr. Huddleston summarized Ms. Moon's conditions, pain, and limitations.[240] He stated three epidural steroid injections provided minimal relief.[241] Dr. Huddleston also stated Ms. Moon is working to reduce her weight and alleviate her back pain.[242]

## III.    STANDARD OF REVIEW

This Court must sustain the SSA's findings of fact if they are supported by substantial evidence and are free of legal error.[243] Substantial evidence is "such relevant evidence as a

---

[232]R. at 557-58.
[233]*Id.*
[234]R. at 559.
[235]*Id.*
[236]R. at 560.
[237]*Id.*
[238]*Id.*
[239]R. at 556.
[240]*Id.*
[241]*Id.*
[242]*Id.*
[243] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

reasonable mind might accept as adequate to support a conclusion."[244] To be supported by substantial evidence, the findings must be such that a reasonable mind might accept them as adequate to support the conclusion.[245] The standard of review is deferential, but the reviewing court must conduct a critical review, considering both evidence that supports and evidence that detracts from the SSA's decision.[246] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the SSA, not the reviewing court.[247] Although the ALJ need not address every piece of evidence or testimony presented, she must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[248] The court will conduct a critical review of the evidence, and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[249]

## IV.   ANALYSIS

Ms. Moon argues that the ALJ's decision should be reversed or remanded because: (1) the AC failed to consider new and material evidence; (2) the ALJ failed to account for all of Ms. Moon's impairments which flawed the RFC assessment; and (3) the ALJ improperly discredited Dr. Shin's opinion. We briefly review all of Ms. Moon's arguments and find no errors warranting remand or reversal.

---

[244]*Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2001); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

[245]*Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); *Richardson v. Perales*, 402 U.S. 389, 401.

[246]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).

[247]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987).

[248] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

[249] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

**A.     Appeals Council Review**

Ms. Moon argues the AC erred under 20 C.F.R. 404.970(b) when it determined the additional records provided after the ALJ decision were not "new and material," and subsequently denied Ms. Moon's request for review. The Seventh Circuit has held that if a claimant provides additional medical evidence to the AC that was not provided to the ALJ, and the AC subsequently denies application for review, then the AC has deemed the additional evidence to not be new and material.[250] So despite the AC's silence as to whether it found the additional evidence to be "new and material," we can infer that it did not, given this rule. The Commissioner argues that the additional evidence was not material, and Ms. Moon fails the good cause requirement for failure to provide this evidence to the ALJ.

Title 20 C.F.R. 404.970(b) provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

Also, the Hearings, Appeals and Litigation Law Manual ("HALLEX") § I-3-3-6 states:

> For the AC to consider additional evidence, the regulations require that the evidence is new, material, and related to the period on or before the date of the ALJ decision. This means the evidence is:
> 1. Not part of the claim(s) record as of the date of the ALJ decision;
> 2. Relevant, i.e., involves or is directly related to issues adjudicated by the ALJ; and
> 3. Relates to the period on or before the date of the ALJ decision,

---

[250]*Farrel v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012).

> meaning it is: (1) dated before or on the date of the ALJ decision, or (2) post-dates the ALJ decision but is reasonably related to the time period adjudicated by the ALJ.

In the current case, Ms. Moon submitted medical evaluations to the AC completed by Dr. Crevier and Dr. Huddleston as part of the additional evidence. The doctors based their evaluations on examinations that postdated the ALJ's decision by ten and eight months respectively.[251] The two doctors provided these medical evaluations by completing the Illinois Department of Human Services physician form, an SSA form for disability applicants.[252] When the form asked to indicate Ms. Moon's lifting capacity, both doctors selected the "[n]o more than ten pounds at a time" option, which was the lowest option available.[253] Furthermore, to describe Ms. Moon's standing and sitting ability, Dr. Crevier selected "[m]ore than 50% reduced capacity," the most severe option;[254] Dr. Huddleston selected the "[u]p to 20% reduced capacity."[255] The form did not request any written support for the physical limitation conclusion, and none was provided.

These medical evaluations satisfied the "new" requirement because they postdated the ALJ decision and, therefore, were not part of the claim record as of the date of the ALJ decision. Along with being new, the medical evaluations were material because they directly related to an issue adjudicated by the ALJ, namely Ms. Moon's RFC. In particular, they were related to the portion of the RFC that stated, "[Ms. Moon] can lift [twenty] pounds occasionally and [ten] pounds frequently, stand for [two]-hours and sit for [six]-hours in an [eight]-hour workday . . . ."[256] Both the physicians opined on Ms. Moon's lifting, standing, and sitting ability in their evaluations. They stated a more

---

[251]R. at 564, 567.
[252]R. at 561, 565.
[253]R. at 564, 567.
[254]R. at 564.
[255]R. at 567.
[256]R. at 33.

severe lifting limitation than the one given in the RFC. Also, although not given in terms of time limitations as described in the RFC, the physicians did assess Ms. Moon's standing and sitting abilities on a percentage of reduced capacity basis. These opinions could have persuaded the ALJ to increase the severity of the stand and sit limitations. Because the physicians' evaluations were directly related and relevant to Ms. Moon's RFC, they were material.

Although the physicians' evaluations were new and material, they did not relate to the adjudicated time period, the time period between Ms. Moon's alleged onset date and the ALJ's decision. Postdated evidence can relate to a claimant's limitations during the adjudicated time period, but the evidence must indicate that it does so.[257] Also, postdated evidence that contradicts other evidence in the record does not relate to the adjudicated time period.[258] Lastly, postdated evidence that describes after-acquired conditions or post-decision deterioration of a pre-existing condition does not relate to the adjudicated time period.[259]

In Ms. Moon's case, there was no indication the postdated evaluations from Dr. Crevier and Dr. Huddleston related to the adjudicated time period and, along with that, there was no indication that Ms. Moon's abilities had not deteriorated from the time of the ALJ decision to the time of the examinations. Thus, Ms. Moon provided no support that the evaluations described her limitations

---

[257] HALLEX I-3-3-6 ("a statement may relate to the period at issue when it postdates the decision but makes a direct reference to the time period adjudicated by the ALJ."); *see also Farrel*, 692 F.3d 770-71 (holding that a postdated diagnosis of fibromyalgia was related to the adjudicated time period because it filled an "evidentiary gap" when the ALJ determined the condition was not severe due to a lack of diagnosis. Furthermore, the diagnosis built on allusions to fibromyalgia in other doctor's reports during the adjudicated time period); *Grate v. Apfel*, No. 99-2391, 1999 WL 1179079, at *3 (7th Cir. 1999)(medical records submitted to the AC after the ALJ decision related to the adjudicated time period because the records were actually made during the adjudicated time period.).

[258] *See Box v. Shalala*, 52 F.3d 168, 172 (8th Cir. 1995) (holding that newly submitted evidence of mental conditions and hypertension was not persuasively related to the claimant's conditions during the adjudicated time period because it was inconsistent with other medical reports in the record).

[259] *See Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) (holding postdated evidence of the claimant's worsening gout condition did not relate to the adjudicated time period because, even though the claimant had been diagnosed with gout during the adjudicated time period, the evidence only spoke to the severity of the condition after the ALJ decision)*; see also Bergmann v. Apfel,* 207 F.3d 1065, 1070 (8th Cir. 2000).

during the adjudicated time period as opposed to the later date of the medical evaluations. Next, not only were the physicians' opinions based on postdated examinations, but they also contradicted other physicians' opinions stemming from the adjudicated time period. For example, during the consultative examination in November 2008, Dr. Patil opined that Ms. Moon had mild difficulty "lifting more than 10-15 pounds, standing for more than thirty minutes or prolonged sitting."[260] Also in November 2008, Dr. Kim opined, although he did not examine Ms. Moon, that she could occasionally lift twenty pounds and frequently lift ten pounds.[261] For the foregoing reasons, we cannot say the AC erred in concluding that the new evaluations referred to Ms. Moon's limitations after the ALJ issued his decision.

The lumbar MRI and the hip x-ray that were additionally submitted are not material because they do not show a reasonable probability that the ALJ would have reached a different conclusion had this additional evidence been before him.[262] This is because the ALJ did not discount Ms. Moon's allegations of disabling hip and back pain because of a lack of objective evidence. The ALJ rejected those allegations because he determined that the treatment Ms. Moon obtained for her hip and back pain was conservative.[263] The regulations allow an ALJ to consider a claimant's treatment history in comparison to their claimed limitations,[264] and this Court is "required to give deference to the ALJ's factual determination stemming from that history."[265] The ALJ noted that Ms. Moon received conservative treatment for her back pain and, despite limited compliance, responded well

---

[260] R. at 355.
[261] R. at 362.
[262] *See Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005).
[263] R. at 35-36.
[264] 20 C.F.R. § 404.1529(c)(3)(v).
[265] *Jones v. Astrue*, No. 11 CV 3958, 2012 WL 4120417 at *8 (N.D. Ill. Sept. 18, 2012).

to her treatment.[266] The ALJ also noted the sporadic treatment history in regards to Ms. Moon's hip problems and found that it did not provide strong support for her allegations of disabling pain.[267] Because the ALJ had already taken into account Ms. Moon's hip and back pain and discounted it, the MRI and x-ray would not likely have changed the determination.

## B.       The Scope of the ALJ's RFC Assessment

Ms. Moon argues the ALJ erred when determining the RFC because the ALJ failed to consider limitations due to Ms. Moon's (1) migraine headaches, (2) depression, and (3) incapability to perform sustained work activity. Ms. Moon argues these omissions caused a flawed RFC.

The RFC describes the most an individual can still do despite his or her limitations[268] on a regular basis, meaning roughly eight hours a day for five days a week.[269] To determine the RFC, the ALJ first considers all the objective medical evidence to decide if there is an "underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms."[270] Then secondly, if the ALJ finds sufficient underlying impairments, the ALJ evaluates the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."[271] During this second step, when the objective medical evidence alone is not able to substantiate the claimant's alleged severity of the impairments, the ALJ must make a finding on the credibility of the claimant's statements about symptoms and their functional effects.[272] In addition

---

[266]R. at 36.
[267]R. at 35.
[268]*See* 20 C.F.R. § 404.1545(a).
[269]*Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).
[270]SSR 96-7p.
[271]*Id.*
[272]*Id.*

to the objective medical evidence, 20 C.F.R § 404.1529 states the ALJ considers the following to assess credibility of alleged pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.[273]

In Ms. Moon's case, the ALJ first found impairments that could reasonably produce Ms. Moon's alleged pain and other symptoms.[274] However, during the second step, the ALJ found that Ms. Moon's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment."[275] Ms. Moon contests this lack of credibility finding. Therefore, the RFC discussion below focuses on the objective medical evidence and the seven factors from the regulations to determine if the ALJ had substantial evidence to make this finding.

### 1. Migraine Headaches

Ms. Moon argues that because the ALJ found the migraine headaches to be a severe impairment during the second step of the SSA prescribed five-step process for disability claims, and because severe impairments, by definition, significantly limit abilities to do basic work activities,

---

[273]20 C.F.R. § 404.1529(c)(3).
[274]R. at 34.
[275]*Id.*

the ALJ must identify limitations due to the migraine headaches when determining the RFC. The guidelines for evaluating a disability do indeed state that a severe impairment "significantly limits [a person's] physical or mental ability to do basic work activities,"[276] but contrary to Ms. Moon's argument, simply having a severe impairment is not determinative of whether limitations exist.[277] Even when the ALJ deems an impairment to be severe, the ALJ still must determine if any limitations exist due to this severe impairment.[278] Thus, the Act does not necessarily require limitations in the RFC for all severe impairments, as Ms. Moon contends.

Moving to the medical evidence and regulatory factors, the ALJ had substantial evidence to find Ms. Moon lacked credibility in regards to her migraine headaches. In terms of objective medical evidence, the ALJ considered that Ms. Moon had an MRI on her brain, which revealed no causes for headaches.[279] Along with the objective medical evidence, the ALJ addressed some of the Act's factors for credibility. The ALJ considered the type, dosage, effectiveness, and side effects of the Imitrex and Motrin when he found these medications helped relieve Ms. Moon of her headaches,[280] and there was no medical evidence of any side effects. Additionally, the ALJ noted that Ms. Moon complained of headaches in 2005 but was still able to work, and she requested a letter from public aid stating she needed to work less.[281] Given this support, the ALJ did not fail to consider the medical and other evidence in determining the limitations of Ms. Moon's headaches.

Also, the ALJ had further reason to discredit Ms. Moon's alleged limitations due to migraine headaches. SSR 96-7p states a claimant's "statements may be less credible . . . if the medical reports

---

[276]20 C.F.R. § 404.1520(c).
[277]*See* 20 C.F.R. § 404.1520(c)-(e).
[278]*Id.*
[279]R. at 36 (*referencing* r. at 335).
[280]R. at 36.
[281]R. at 297.

or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." The ALJ noted that Ms. Moon had refused to take prescribed medications for her headaches in the past.[282] Ms. Moon stated that she did not take her medications for fear of side effects.[283] However, there is no medical record of any side effects, and the ALJ may discount testimony regarding side effects if not substantiated by evidence.[284]

## 2. Depression

Again, before applying the regulations to the ALJ's credibility finding, we address Ms. Moon's arguments. Ms. Moon argues that, even though the ALJ did not find depression to be a severe impairment, the ALJ still must include limitations due to depression because the ALJ is required to consider limitations and restrictions from all impairments. Furthermore, she argues that because the ALJ found mild limitations in functional areas during the second step of the five-step disability claim process, the ALJ was required to include these limitations in the RFC. The Commissioner contends that the ALJ was not required to include work-related functional limitations even if he found mild limitations from the depression, Ms. Moon did not provide any credible medical evidence of depression, and the ALJ's interpretation of the evidence was reasonable. Ms. Moon did not contest these arguments in her reply brief.

As explained above, however, the ALJ is not required to include limitations from all impairments. Similarly, the regulations do not require the ALJ to reduce work capacity from all limitations.[285] When the ALJ assesses physical and mental abilities for the RFC assessment, 20 C.F.R. § 404.1545(b)-(c) state the ALJ first assesses the nature and extent of the limitations and

---

[282]R. at 35 (*referencing* r. at 328).
[283]*Id.*
[284]*Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985).
[285]*See* 20 C.F.R. § 404.1545(b)-(c).

restrictions. After this assessment, the ALJ then determines the capacity for work on a regular and continuing basis,[286] which may not result in a reduction. The Act further states an ALJ *may* find a limited ability to carry out certain physical and mental activities to reduce work ability.[287] Thus, the Act does not require the ALJ to reduce work capacity when the ALJ finds limitations as Ms. Moon contends.

Moving to the SSA regulation's, the ALJ adequately considered the medical evidence and the factors required to discredit Ms. Moon's allegations of disabling depression. In terms of medical evidence, the ALJ discredited Dr. Shin's opinion,[288] which was the only medical opinion in the record stating Ms. Moon had depression. Also, the ALJ found Ms. Moon's three doctor's visits over three months to be limited treatment for the alleged depression.[289] Next, the ALJ addressed the activities of daily living, duration, frequency, and intensity factors when he found only mild limitations due to Ms. Moon's depression and, therefore, did not find reason to reduce Ms. Moon's capacity for work.[290] The ALJ found mild mental limitations in three functional areas: activities of daily living, social functioning, and concentration, persistence, or pace.[291] Furthermore, for a fourth functional area, episodes of decompensation, the ALJ found no episodes of decompensation of extended duration.[292] To support these findings, the ALJ cited evidence such as Ms. Moon's ability

---

[286] 20 C.F.R. § 404.1545(c).
[287] *Id.*
[288] R. at 37.
[289] R. at 500.
[290] R. at 32.
[291] *Id.*
[292] *Id.*

to: care for her daughter;[293] grocery shop alone;[294] interact and communicate with others;[295] read books,[296] and the absence of hospital stay due to decompensation.[297]

### 3.    Sustained Work Capability

For Ms. Moon's last RFC argument, she contends that her episodes of severe pain would cause her to frequently miss work and, therefore, she is not able to adequately perform "sustained work activities." The Commissioner responds that the ALJ had substantial evidence to find Ms. Moon's alleged sustained work incapability not credible. Ms. Moon did not contest this argument in her reply brief.

The ALJ stated that he discounted Ms. Moon's allegation of her inability to perform sustained work because it was based solely on Dr. Shin's opinion, which the ALJ gave little weight. Although this is the only reason the ALJ expressed specifically for this particular allegation, the ALJ also provided substantial evidence to discredit Ms. Moon generally. For example, the ALJ noted Ms. Moon can perform cooking, cleaning, and other daily activities as well as take care of her child. Second, the ALJ noted that while Ms. Moon stopped going to her physical therapy appointments because of her alleged debilitating pain, Ms. Moon's claims contradicted the physical therapist's reports of improvements in pain, and Ms. Moon still was still able to attend her chiropractic appointments three days a week.[298] Along with that, even if Ms. Moon had attended all appointments, the ALJ found the physical therapy and chiropractic treatment to be conservative treatment for the

---

[293]R. at 32, 64.
[294]R. at 32, 66.
[295]R. at 32, 65.
[296]*Id.*
[297]R. at 32.
[298]R. at 80-81.

alleged severity of pain.[299] The ALJ also noted Ms. Moon had relief from back pain during an office visit with Dr. Crevier, which took place during the alleged disability period.[300]

This evidence adequately addressed the activities of daily living, treatment, and functional limitation factors used to assess credibility. Therefore, this evidence provided sufficient support for the ALJ's determination that Ms. Moon's episodes of pain were not as severe as she claimed and would not preclude her from working as frequently as she claimed.

## C.      Dr. Shin's Opinion

Ms. Moon argues the ALJ erred because he did not give any weight to Dr. Shin's medical opinion, which stated Ms. Moon had severe depression. The Commissioner argues that the ALJ had sufficient reasons to discount Dr. Shin's opinion and that Dr. Shin was not a treating source. Ms. Moon did not further argue or contest these arguments in her reply brief.

When the Commissioner evaluates medical opinions, 20 C.F.R. § 404.1527 states the Commissioner will consider the following to determine the weight given to the medical opinion:(1) the examining relationship; (2) the length of the treatment relationship; (3) the frequency of the examinations; (4) the nature and extent of the treatment relationship; (5) the amount of relevant evidence to support an opinion; (6) the consistency with the record; (7) the physician's specialization of knowledge; and (8) other factors the claimant presents to the SSA. Furthermore, if the ALJ discredits a physician's opinion after considering these factors, this Court must affirm the ALJ's decision when the ALJ "minimally articulated" his reasons for discrediting the opinion.[301]

The ALJ addressed several of these eight factors and "minimally articulated" his reasons for

[299]R. at 36.
[300]R. at 36 (*see* r. at 524).
[301]*Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

discrediting Dr. Shin's opinion. The ALJ noted the length and frequency of Ms. Moon's treatment relationship was three office visits over only three months.[302] The ALJ found that Dr. Shin provided minimal treatment notes and no other relevant evidence to support his opinion.[303] In terms of the nature and extent of the relationship, the ALJ noted Dr. Shin diagnosed Ms. Moon with severe depression,[304] yet the record suggests a lack of treatment. Ms. Moon took no psychotropic medications[305] and, as stated above, the relationship was short.[306] Further speaking to the nature and extent of the treatment relationship, the ALJ noted the relationship ended when Dr. Shin signed a Social Security disability benefits form,[307] and Dr. Shin noted, "a physician's form was completed by her lawyers who assisted to get [Social Security]."[308] The ALJ articulated this discussion of the treatment relationship and relevant evidence to support discrediting Dr. Shin's opinion.[309]

Then Ms. Moon argues that Dr. Shin was a treating source and the ALJ ran afoul of the "treating physician rule," which states, "[t]reating sources are important sources of medical evidence and expert testimony, and that their opinions . . . are entitled to special significance; sometimes the medical opinions of treating sources are entitled to controlling weight."[310] However, the ALJ "need not blindly accept a treating physician's opinion – she may discount it if it is internally inconsistent or contradicted by other substantial evidence in the record."[311] For example, in *Henke v. Astrue*, the Seventh Circuit affirmed the ALJ's decision to reject a treating physician's opinion.[312] There, the

---

[302]R. at 35 (*referencing* r. at 500).
[303]R. at 37 (*referencing* r. at 493-502).
[304]R. at 37 (*referencing* r. at 497).
[305]R. at 37 (*referencing* r. at 59).
[306]R. at 37 (*referencing* r. at 500).
[307]R. at 37 (*referencing* r. at 506).
[308]R. at 37 (*referencing* r. at 499).
[309]R. at 37.
[310]SSR 96-5p.
[311]*Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012).
[312]*Id.* at 640.

ALJ rejected one questionnaire from the treating physician due to lack of support in the treatment notes.[313] The ALJ also rejected a second questionnaire containing conclusions about the claimant's chronic back pain, hip pain, and degenerative joint disease because these limitations "were otherwise absent from the medical record, were never treated, and were unsupported by any objective medical evidence."[314] In addition, the ALJ found that other medical evidence contradicted the treating physician's conclusions.[315]

Similar to *Henke*, here too Dr. Shin's opinion is supported with limited treatment notes. Also, similar to how the limitations in *Henke* "were otherwise absent from the medical record, were never treated, and were unsupported by any objective medical evidence," here the ALJ noted that Dr. Shin was the only medical provider to diagnose Ms. Moon with severe depression, and Ms. Moon received minimal treatment.[316] Although the ALJ did not cite any evidence contradicting Dr. Shin's opinion, the ALJ did suggest internal inconsistencies given the severe diagnosis coupled with the limited treatment.[317]

Finally, Ms. Moon argues that Dr. Shin was the only mental health provider to offer an opinion, and the ALJ must therefore consider Dr. Shin's opinion because it was "the preponderance of the evidence." However, as discussed above, the ALJ had sufficient ground to discredit Dr. Shin's opinion, and Ms. Moon's argument that the ALJ was required to consider the opinion simply because it was the only mental health opinion is without merit. For the foregoing reasons, the ALJ did not err when he did not consider Dr. Shin's medical opinion.

---

[313]*Id.*
[314]*Id.*
[315]*Id.*
[316]R. at 37.
[317]*Id.*

## V.     CONCLUSION

For the reasons set forth above, Ms. Moon's motion for summary judgment is denied [dkt. 16].

**IT IS SO ORDERED.**

Date:  <u>September 25, 2013</u>

Susan E. Cox
U.S. Magistrate Judge